UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
ANDRES ROJO,                                              :
                                                          :
                    Plaintiff,                       :
                                                          :    06 Civ. 13574 (HB)
      - against -                                       :
                                                          :    OPINION &
                                                          :    ORDER
DEUTSCHE BANK,                                            :
                                                          :
                    Defendant.                       :
                                                          :
------------------------------------------------------------------------x

HON. HAROLD BAER, U.S.D.J.:

        Plaintiff Andres Rojo commenced this action against Defendant Deutsche Bank,[1] for material breaches of his employment contract, unjust enrichment, liability in quantum meruit, promissory estoppel, and fraud.  Deutsche Bank moved for summary judgment before Judge Sand, which resulted in the dismissal of the contract claims.[2]  The case was thereafter referred to me and the remaining claims were tried during a two-day bench trial.  Thereafter, the parties submitted post-trial briefs.  This case was sub judice on March 24, 2010.  Based on my findings of fact and the conclusions of law that follow, I conclude that Deutsche Bank is not liable to Rojo on any of his remaining claims, and the Complaint must be dismissed.

## I.  FINDINGS OF FACT

### A.  Deutsche Bank Recruits the J.P. Morgan Team

        The history of this case begins in September of 2000, when J.P. Morgan announced a merger with Chase Manhattan Bank.  At the time, Plaintiff was employed by

---

[1] As noted in Judge Sand's Memorandum & Order of Nov. 5, 2008, Plaintiff names "Deutsche Bank" as Defendant in this action.  It appears from the pleadings and Joint Pretrial Order, however, that Plaintiff intended to name Deutsche Bank Trust Company Americas and its predecessors.
[2] Plaintiff's sixth cause of action seeking to enforce his right to an additional 2005 bonus payment and an additional severance payment was abandoned at the summary judgment stage.  See Joint Pretrial Order at 4.

J.P. Morgan, where he was a Vice President in the Latin America division of the J.P. Morgan Private Bank. Rojo Dir. ¶ 7; Trial Tr. 30:3-10 (hereinafter "Tr.").[3] After the merger announcement, Plaintiff was approached by several banks that sought to recruit him and other members of his team at J.P. Morgan. Plaintiff opines that he had discussions about employment with Merrill Lynch, Prudential Securities, Goldman Sachs, Citibank, and Deutsche Bank. Rojo Dir. ¶ 6. The essence of Rojo's fraud claim is that Deutsche Bank made certain fraudulent misrepresentations during employment negotiations that caused him to enter into an employment agreement with the Bank, a decision that he alleges ultimately proved to be damaging to him and his career.

Rojo's discussions with Deutsche Bank began in October of 2000, when he met with Carlos Padula, then co-head of Deutsche Bank's Private Wealth Management Latin America Division. Rojo Dir. ¶¶ 9-10. Padula expressed interest in recruiting Rojo to join Deutsche Bank, and at least initially, Rojo said that he was happy at J.P. Morgan. Rojo Dir. ¶ 9; Padula Dir. ¶16. Nevertheless, Rojo spoke with his colleagues at J.P. Morgan about opportunities at Deutsche Bank, and assembled a group of fourteen bankers and brokers, at varying levels of seniority, who were interested in a possible move to Deutsche Bank (collectively, the "J.P. Morgan team"). Rojo Dir. ¶ 12. In November or December of 2000, Rojo and his J.P. Morgan colleague, Houda Foster, attended meetings with Padula and other senior executives in Deutsche Bank's Private Wealth Management division, including Berndt von Maltzan, then Global Head of Private Wealth Management, and Herbert Scheidt, then Head of International Private Wealth Management. Rojo Dir. ¶ 13, Padula Dir. ¶ 18.

During the meetings, the Deutsche Bank executives expressed the Bank's interest in expanding its business in Latin America, while Rojo and Foster described their Latin America business at J.P. Morgan. Padula Dir. ¶ 20. Rojo told Padula that his team could likely bring to Deutsche Bank about thirty percent of the assets they were managing at J.P. Morgan. Tr. 45:17-18. The parties disagree about the amount of assets that each expected the J.P. Morgan team to bring to Deutsche Bank. Padula understood that the J.P. Morgan team managed $9 billion in assets, and therefore projected that the team

---

[3] Pursuant to my individual practices governing bench trials, declarations signed under penalty of perjury were submitted for each witness in lieu of direct testimony.

would bring $3 to $5 billion in assets to Deutsche Bank.  Deutsche Bank then used this estimate as a guideline in building compensation packages for the J.P. Morgan team and in estimating revenues that would be gained through the acquisition.  Padula Dir. ¶ 20.  Rojo, meanwhile, was unaware of Deutsche Bank's projections, and insists that $9 billion came up during discussions with Padula only because it was the total amount of J.P. Morgan assets in Latin America after its merger with Chase.  Tr. 47:3-5.  Pre-merger, the J.P. Morgan team's business totaled $4.2 billion; Rojo therefore estimated that the team would bring approximately $1.4 billion to Deutsche Bank.  Tr. 48:7.  Rojo and Padula both acknowledged that whatever the asset base, they expected relatively lower returns in the first years after the move, and higher returns later on.  Tr. 48:10-13.

### B. Rojo Negotiates Compensation Packages

Plaintiff negotiated with Deutsche Bank to assemble proposed compensation packages for the J.P. Morgan team.[4]  Tr. 49: 8-18.  The compensation packages included some combination of several components: base salary, a sign-on bonus, guaranteed annual incentive compensation, and an incentive compensation pool to be shared by the team.  Rojo Dir. ¶15.  Rojo was offered a managing director position, in which he would serve as Senior Relationship Manager and Global Market Head for the Southern Cone Region of South America.[5]  Tr. 39:19-40:11.  His salary was set at $250,000 per year, in addition to which his contract provided for a sign-on bonus of $600,000 and a guaranteed bonus of $1.75 million for each of his first two years at Deutsche Bank.  Tr. 41:12-23.  In addition, Deutsche Bank agreed to create a guaranteed incentive compensation pool to be shared by the J.P. Morgan team, known as the Finder's Pool, which would accrue according to a formula based on the assets that the team brought to Deutsche Bank.  Rojo

---

[4] Rojo's colleague, Houda Foster, also participated in these negotiations, and a lawyer reviewed Deutsche Bank's final compensation packages before members of the J.P. Morgan team accepted the offers.  Tr. 49:8-18.

[5] During the relevant time period, Deutsche Bank's Private Wealth Management business was divided into four geographic regions:  the United States, Asia, Germany, and International.  Padula Dir. ¶ 9.  The International division, in turn, consisted of four regions:  Europe, Latin America, Middle East, and Germany Offshore.  The Latin America division, in which Plaintiff was employed, was further divided into four sub-markets, namely, Andean, Brazil, Mexico, and Southern Cone.  The Southern Cone region included Argentina, Chile, and Uruguay.  Id.

Dir. ¶ 15; Tr. 42:22-43:5.  Although Deutsche Bank created compensation projections and break-even analyses based on the estimated assets, Rojo was never shown the projections, nor did he ask to see them.

### C. The Cost of the Acquisition Did Not Appear on the Latin America P&L and Was Accounted for Centrally

During negotiations, Rojo told Padula that he was concerned about how Deutsche Bank would account for the cost of the acquisition, because of the size of the proposed J.P. Morgan compensation packages relative to the level of business in Deutsche Bank's Latin America Private Wealth Management business.  Tr. 52:22-24.  Specifically, Rojo expressed concern that the Latin America group would operate at a loss for several years after the acquisition of the J.P. Morgan team.  Padula agreed that losses were likely in the early years.  Tr. 54:17-19.  Rojo asked Padula whether compensation for the team would come out of the operating expenses of the Latin American division.  Rojo Dir. ¶ 15.  Padula told Rojo that the cost of the acquisition would not appear on the Profit & Loss Report (P&L) for Deutsche Bank's Latin America Private Wealth Management group.  Tr. 65:24-25.  Indeed, as both parties acknowledge, there was never a P&L for Latin America that reflected the compensation that Deutsche Bank paid to the members of the J.P. Morgan team.  Tr. 65:2-5; 143:1-3.

Padula also assured Rojo that the acquisition of the J.P. Morgan team would be financed centrally, because Deutsche Bank's decision to hire Rojo and his colleagues was part of a long-term strategy.  Tr. 55:17-19.  The deal required final approval by the Vorstand, the Board of Directors that leads Deutsche from its central office in Frankfurt.  Tr. 137:5-12.  Padula told Rojo that the Bank was aware that it would take time for the deal to become profitable.  Tr. 56:1-6.  Although Rojo sought assurances that the cost of the acquisition would not appear on the Latin America P&L, he did not ask Padula for details about how Deutsche Bank planned to account for acquisition.  Tr. 69:22-24.  Padula assured Rojo that the cost of the acquisition would not immediately affect the balance sheet of the Latin America region (Tr. 144:2-5), but cautioned Rojo that he was not familiar with the way in which Deutsche Bank would account for bonuses paid to the J.P. Morgan group.  During negotiations of the compensation packages, Rojo did not press for any further information or accounting.  Tr. 69:22-24.

4

Ultimately, when it came time to pay bonuses, the revenue stream of the Latin America region was not sufficient to cover the bonus payments guaranteed to the J.P. Morgan team.  Von Maltzan Decl. ¶ 27.  Consequently, Deutsche Bank's central management subsidized bonuses for the Latin America region using revenues from other international regions.  Tr. 222:10-14.  When the Bank's central office in Frankfurt reviewed the P&Ls for the Private Wealth Management business on a worldwide basis, the P&L for each region was shown without the cost of bonuses.  Tr. 240:11-18.  The worldwide bonus accrual for the wealth management business was reflected in a separate column for centralized costs.  Tr. 250:24-251:1.  This illustrates the way in which compensation was controlled centrally, rather than being accounted for on a regional basis.

### D. Rojo Agreed To Changes in His Compensation Package

Written offers of employment for the J.P. Morgan team were finalized in March 2001, when most members of the team began work at Deutsche Bank; however, Plaintiff did not begin work until September 2001, because of delays in the processing of his application for a green card.[6]  Tr. 73:1-4.  His contract was signed on September 23, 2001.  Tr. 146:7-8.

Once Rojo started work at Deutsche Bank, he and Padula traveled to Europe together.  While in Frankfurt, Padula met with von Maltzan, who said that Deutsche Bank wanted to change the structure of the shared J.P. Morgan team incentive compensation pool, then known as the Finder's Pool.  Tr. 146:9-13.  Von Maltzan explained that the structure of the Finder's Pool was creating accounting problems for Deutsche Bank —a change that required altering the contracts of the J.P. Morgan team.  Tr. 77:12.  The accounting problems were created by Deutsche Bank's move from international accounting standards to U.S. GAAP, a switch necessitated by Deutsche Bank's becoming listed on the New York Stock Exchange on October 1, 2001.  Tr. 147:4-9.  Under U.S. GAAP, Deutsche Bank would need to accrue the costs of the Finders Pool on its financial

---

[6] Although perhaps not relevant to my legal conclusions, it is worth noting that Plaintiff received his guaranteed full-year bonus of $1.75 million for 2001, even though he worked for Deutsche Bank for less than a third of that year.

5

statements each year beginning in 2001, even though the pool was not to be paid out until 2004.[7]  Von Maltzan Decl. ¶ 29; Padula Decl. ¶ 44.

While Deutsche Bank cited problems associated with accounting for the Finders Pool as the reason it wanted to amend the J.P. Morgan contracts, it is clear that the amendment would also serve to reallocate the funds that were assigned by Deutsche Bank's management to the Latin America group for 2001 bonuses.  Tr. 231:4-232:22.  The central management had assigned a fixed bonus pool to Latin America, and guaranteed bonuses for the J.P. Morgan team threatened to use up nearly the entire pool.  Tr. 232:9-11.  Although the leaders of the Latin America group could have gone back to the central management to request an increase in the size of the region's bonus pool, they chose instead to move quickly on the renegotiation of employment agreements for the J.P. Morgan team.  Tr. 232:15-233:9.

Deutsche Bank's senior executives attest that they knew that the Bank was legally bound by the terms of the employment agreements that it had earlier reached with Rojo and the other members of the J.P. Morgan team; however, the Bank decided to pursue the amendment by seeking the J.P. Morgan team's consent to an amendment to their agreements.  Von Maltzan Decl. ¶ 32.  Both Von Maltzan and Padula discussed the proposed amendment with Rojo.  Kahl Decl. ¶ 40.  Rojo and other members of the J.P. Morgan team reached an agreement with Deutsche Bank to amend their contracts, pursuant to which the team received extensions of their guaranteed bonuses.  Id. at ¶ 43.  The First Amendment to Rojo's original agreement substituted a revenue-based Special Incentive Pool ("SIP") for the assets-based Finder's Pool.  This change eliminated the accrual issue.  Id.  In addition, because payments pursuant to the SIP would not be payable until after the completion of the 2004 fiscal year, Rojo was given additional

---

[7] The employment agreements between Deutsche Bank and members of the J.P. Morgan team specified that the Finders Pool would be paid in 2004 to all members of the J.P. Morgan team who either remained employed by Deutsche Bank on December 31, 2003, or who had been terminated by the Bank without Cause, as defined in the agreements, prior to that date.  The Finders Pool was to be funded based upon a percentage of the amount of new assets that the J.P. Morgan team brought to Deutsche Bank in 2001, 2002, and 2003, and the revenues produced on those assets.  The formula for calculating the total Finders Pool was 1% of the new assets plus 40% of the revenue on those assets divided by 2.  The payments were to be 70% in cash, 30% in equity.  Rojo Dir. ¶ 21; Padula Dir. ¶¶ 36, 37, 44.

years of guaranteed bonuses.  Id. at ¶ 45. Rojo would receive $1.75 million for 2003, and $1,050,000 for 2004.  Tr. 80:21-24.

Finally, at the end of 2002, Deutsche Bank approached Rojo to ask whether he would give up a portion of his $1.75 guaranteed bonus for that year, in order to increase the bonus pool for junior members of the team.  Rojo agreed to give up $400,000, but again acknowledges that he was free to decline Deutsche Bank's request.  In fact, his colleague, Houda Foster, declined to give up a portion of her guarantee.  Tr. 96:21.

## II.  CONCLUSIONS OF LAW

**A.  Plaintiff Failed To Prove Fraud at Trial**

The essence of Rojo's fraud claim is that Deutsche Bank made certain fraudulent misrepresentations that induced him to enter into an employment agreement with the Bank.  To prove fraud, Rojo is required to show by clear and convincing evidence that (1) Deutsche Bank made a material misrepresentation of an existing fact; (2) Deutsche Bank intended to defraud Rojo thereby; (3) Rojo reasonably relied upon the representation; and (4) Rojo suffered damage as a result of such reliance.  See Bridgestone/Firestone v. Recovery Credit Servs., Inc., 98 F.3d 13, 19 (2d Cir. 1996); Century Pac., Inc. v. Hilton Hotels Corp., 528 F.Supp.2d 206, 218-19 (S.D.N.Y. 2007), aff'd 354 Fed. App'x 496 (2d Cir. 2009).[8]

(1) *Deutsche Bank Did Not Make a Material Misrepresentation, and Therefore Could Not Have Intended to Defraud Rojo*

Rojo's fraud claim rests on his theory that Padula made false representations when he told Rojo that (1) bonus costs for the J.P. Morgan team would not appear on the Latin America P&L, and (2) Deutsche Bank would treat the deal as an acquisition that

---

[8] To the extent that Plaintiff intended to plead fraud in the inducement rather than a generalized cause of action for fraud (see Complaint ¶¶ 40 – 50) the elements are quite similar. To prove fraud in the inducement, Rojo would be required to show (1) that the defendant made a representation; (2) as to a material existing fact; (3) which was false; (4) and known to be false by the defendant; (5) that the representation was made for the purpose of inducing the plaintiff to rely upon it; and (6) that the plaintiff reasonably did so rely; (7) in ignorance of its falsity; (8) to his injury.  See Petrello v. White, 344 Fed. App'x 651, 653 (2d Cir. 2009).

would be financed, accounted for, and amortized centrally.  See Tr. 15:20-25.  As discussed above, the evidence shows that both of these representations were true.

First, the parties agree that the bonuses paid to the J.P. Morgan team did not appear on the Latin America P&Ls.  Second, Deutsche Bank demonstrated at trial that its acquisition of the J.P. Morgan team was financed by the International division of Deutsche Bank's Private Wealth Management business.  See Tr. 151-154.  Revenues in the Latin America division were relatively low during the initial years of Rojo's employment, and Deutsche Bank's central management assigned a bonus pool to Latin America that was scarcely large enough to cover the guaranteed bonuses to bankers in that region.  As a consequence, the International division used its global bonus pool to cover the guaranteed bonus amounts—Latin America bonuses did not come directly out of Latin America revenues, nor did they appear on the Latin America P&L.  Furthermore, Padula had no way of knowing, when he negotiated Rojo's employment agreement, exactly what bonus pool would be assigned to the Latin America group by the Bank's central management.  All he could—and did—tell Rojo was that the Bank would centrally account for the cost of acquiring the J.P. Morgan team, and would assign a bonus pool centrally.  Indeed, this is precisely what happened.  Padula never promised that Deutsche Bank would not track the J.P. Morgan team's performance, or that the Bank would not track revenues for that region.  Since all Padula's statements to Rojo during the course of employment negotiations were true, they could not have been made with intent to defraud.

This conclusion is not altered by the fact that that Deutsche Bank sought to change the incentive compensation pool from asset-based to revenue-based after commencement of Plaintiff's employment.  The change was made in order to comply with the accounting requirements of U.S. GAAP, which took effect when Deutsche Bank was listed on the New York Stock Exchange ("NYSE") on October 1, 2001.  See Tr. 145:1-147:20.  Padula opines he did not know about the accounting impact of Deutsche Bank's listing on the NYSE until November of 2001, long after the terms of the deal were negotiated.  Rojo sees it differently and urges the Court to find that Padula knew of the accounting change, or at least that it was in the wind at the time the deal was negotiated. Tr. 84:13.  Unfortunately, "in the wind" is not enough to meet the clear and

convincing standard required of the Plaintiff.  Further, as between the two, Padula appeared the more credible.

Rojo testified that he did not inquire as to the precise way in which the Bank would account for the acquisition, but rather sought Padula's assurances that the bonuses would not be charged to the Latin America P&L, which they were not.  Tr. 70:9-18.  Regardless of Deutsche Bank's motive for altering the terms of the Finders Pool, it compensated Rojo and other members of the J.P. Morgan team with the agreed-upon guaranteed bonuses and set up a Special Incentive Pool for 2005 and beyond.   Judge Sand found in his Memorandum & Order granting Summary Judgment to Defendant on Plaintiff's contract claims that Rojo had received consideration for each amendment to his employment agreement.  (See Memorandum and Order, Nov. 5, 2008).

(2) *It Was Not Reasonable for Rojo to Rely Solely on Padula's Statements; Therefore, Rojo Could Not Suffer Damages as a Result of Such Reliance*

Even if Deutsche Bank's statements had been false—which they were not—Rojo would need to establish that his reliance on those statements was justifiable in order to prove fraud.  See Compania Sud-Americana de Vapores v. IBJ Schroeder Bank & Trust, 785 F.Supp. 411, 421 (S.D.N.Y. 2001).  To assess the reasonableness of alleged reliance, courts in this Circuit "consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them," including whether the parties were represented by counsel.  Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 195 (2d Cir. 2003).  Where sophisticated parties engage in a high-stakes transaction, "a party lacking information cannot reasonably rely on oral representations from a negotiator on the other side of a proposed transaction, and must be expected to demand documented confirmation or otherwise perform basic due diligence." Baraliu v. Vinya Capital, L.P., 2009 WL 959478 at *8 (S.D.N.Y. Mar. 31, 2009).

Rojo is a sophisticated banker with over twenty years of experience on Wall Street, and has worked at several investment banks.  He took on a leadership role in negotiating compensation packages not only for himself, but also for a dozen other members of the J.P. Morgan team; the team retained counsel, as well.  Although the transaction may not have been critical for Deutsche Bank, a worldwide corporation with

billions of dollars in holdings, it was certainly a high-stakes transaction for Rojo and his colleagues. If Rojo wanted additional assurances as to how Deutsche Bank was to account for the cost of the acquisition, he could have requested copies of revenue projections, etc.; he never did. See Baraliu at *8 (a sophisticated party can be expected to have "insisted on securing available documentation").

Finally, Rojo readily agreed to both the first and second amendments to his contract, without asking for any further information about Deutsche Bank's bonus pool accruals. Thus, even if Padula's statements had been false, Rojo was not justified in relying solely on those statements, because Rojo could easily have gained additional, written information about Deutsche Bank's plans. Further, while the Plaintiff alleges great gobs of damages at Padula's hands, he suffered none.

## B. The Existence of a Valid Contract Precludes Rojo's Claims of Unjust Enrichment and Liability in Quantum Meruit

In addition to the breach of contract claim that was dismissed at the summary judgment stage, and the fraud claim discussed above, Rojo alleges causes of action for unjust enrichment, quantum meruit, and promissory estoppel.[9]

*1. Unjust Enrichment and Quantum Meruit*

Unjust enrichment and quantum meruit are quasi-contract claims, and may be analyzed together under New York law. See Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 175 (2d Cir. 2005) (Sotomayor, J.) ("Applying New York law, we may analyze quantum meruit and unjust enrichment together as a single quasi contract claim."). The existence of a valid contract precludes quasi-contract claims, because they serve as equitable remedies that operate where no valid contract exists. See In re First Central Financial Corp., 377 F.2d 209, 213 (2d Cir. 2004) ("A quasi or constructive contract…is an obligation which the law creates *in the absence of any agreement*."). Here, the two parties entered into a valid written agreement that was twice amended, for which adequate consideration was exchanged at every stage.

---

[9] At the summary judgment stage, this Court (Sand, J.) declined to dismiss Plaintiff's quasi-contract claims along with his contract claims, because it was "possible that Plaintiff may have a viable fraud claim." Now that the Court has established that the Plaintiff's fraud claim fails, his quasi-contract claims must too be dismissed.

10

See Memorandum and Order, Nov. 5, 2008, at 11 (Sand, J.). Furthermore, since Rojo has failed to show that Deutsche Bank knowingly misrepresented a material fact in negotiations for the agreement or the amendments, he has failed to show fraudulent inducement. Since I found that the employment agreement was valid, Plaintiff may not recover in quasi-contract for any claimed losses in connection with his Deutsche Bank employment. See Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d 382 (1987) ("The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter.")

Even if there was no valid agreement to govern the relationship between the parties, Rojo's claims would be doomed under these equitable remedies. To prevail on an unjust enrichment claim, a plaintiff must show that (1) the defendants were enriched; (2) that the enrichment was at plaintiff's expense, and (3) that the circumstances are such that equity and good conscience require the defendants to make restitution. Bloom v. Rock, 2010 WL 2267468 (S.D.N.Y. May 27, 2010) at *8; see also Louros v. Cyr, 175 F.Supp.2d 497, 514 n.8 (S.D.N.Y. 2001). As the evidence at trial shows, Rojo received compensation at or above market rates throughout his employment at Deutsche Bank, despite the fact that the J.P. Morgan team's performance was disastrous during the contract term. See Rojo Direct ¶ 58, 60. In 2001, Rojo received a total of $2.6 million in salary and incentive compensation, for all of three months of work. Rojo Dir. ¶ 21; Padula Dir. ¶ 43. In 2002, Rojo received $1.6 million in salary and incentive compensation, in 2003, he received $2 million in salary and incentive compensation, and in 2004, he received $1.3 million in salary and incentive compensation. Rojo Dir.¶ 97; Padula Dir. ¶ 68, 78. This level of compensation, just to round out the picture, was even well above what Padula, Rojo's boss, was paid. Tr. 30:3-31:16; Padula Dir. ¶ 46. Given the level of compensation that Rojo received, especially against the background of disappointing revenues during the years in question, Rojo has failed to show circumstances which, in equity and good conscience, would obligate Deutsche Bank to compensate the Plaintiff under any known equitable remedy.

### C. Promissory Estoppel

To complete the picture, Rojo alleges a cause of action for promissory estoppel on the premise that Padula made certain oral promises during the course of employment negotiations that, in the absence of a valid contract, would be enforceable. First of all, as discussed above, there was a valid contract, and secondly, New York law, which governs here, does not recognize promissory estoppel in the employment context. See Henry v. Dow Jones, 2009 WL 210680 (Jan. 28, 2009) at *5 n. 8; Deutsch v. Kroll Associates, Inc. 2003 WL 22203740 (S.D.N.Y. Sept. 23, 2003) at *3; Graff v. Enodis Corp., 2003 WL 1702026, at *2 (S.D.N.Y. Mar.28, 2003), Shapira v. Charles Schwab & Co., 225 F.Supp.2d 414, 419 (S.D.N.Y.2002); Phansalkar v. Andersen Weinroth & Co., L.P., 2002 WL 1402297, at *17 (S.D.N.Y. June 26, 2002); Pancza v. Remco Baby, Inc., 761 F.Supp. 1164, 1172 (D.N.J.1991) (under New York law, "promises surrounding an employment relationship are insufficient to state a cause of action for promissory estoppel"); see also Dalton v. Union Bank of Switzerland, 520 N.Y.S.2d 764, 766 (N.Y. App. Div. 1987). Judge Sand declined to reach the promissory estoppel claim at the summary judgment stage, because Deutsche Bank did not address the applicability of the doctrine in its motion for summary judgment. See Memorandum and Order, Nov. 5, 2008, at 15. In short, Plaintiff's claim for promissory estoppel cannot succeed.

### III. ORDER

For the reasons stated above, it is hereby ORDERED that the Clerk of Court enter judgment dismissing the Complaint, close the case and remove it from my docket.

IT IS SO ORDERED.
New York, New York
June 23, 2010

_____
U.S.D.J.